# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

TESFAY GEBREMICAEL,       )
                            )
      Plaintiff,         )      CASE NO.  3:12-cv-0064
                            )      Chief Judge Haynes
v.                       )
                            )
CENTRAL PARKING SYSTEM, INC.,  )
                            )
      Defendant.      )

## M E M O R A N D U M

Plaintiff, Tesfay Gebremicael, filed this action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. ("Title VII") against the Defendant, Central Parking System, Inc. ("CPS"), his former employer. Plaintiff alleges discrimination based on his national origin as well as retaliation for reporting the discrimination.

Before the Court is Defendant's motion for summary judgment (Docket Entry No. 13), contending, in sum: (1) that Plaintiff failed to exhaust his administrative remedies on his failure to promote and excessive drug tests claims; (2) that Plaintiff was not discriminated against because of his national origin or race; (3) that the Defendant did not retaliate against Plaintiff for submitting a complaint of national origin discrimination; (6) that Defendant has articulated legitimate non-discriminatory reasons for Plaintiff's termination; (7) that Plaintiff's proof cannot prove those reasons to be a pretext for discrimination or retaliation; and (8) that Plaintiff's claim for back pay fails as a matter of law.

## A. Findings of Fact[1]

Plaintiff, Tesfay Gebremicael, is of Eritrean origin, and sought political asylum in the United States in 1998. (Docket Entry No. 22-20, Plaintiff's Reply to Defendant's Statement of Undisputed Facts, at ¶1). Plaintiff was employed by CPS from June 7, 2001 to January 22, 2002, and April 29, 2003 to July 23, 2010. Id. at ¶3.

Plaintiff's employment was initially terminated in 2002 because CPS demanded an unexpired work authorization card from Plaintiff. Id. As a political refugee, Plaintiff asserts that CPS was required by law not to request such documentation. Id. After Plaintiff complained to the Office of Special Counsel for Immigration-Related Unfair Employment Practices, CPS and Plaintiff settled the matter. Id. CPS reinstated Plaintiff to his prior position and paid Plaintiff $1500 for use in payment of attorney's fees. (Docket Entry No. 22-1, Settlement Agreement, at 2).

Starting in April 2003, Plaintiff worked as a part-time valet at the Tennessee Performing Arts Center. In July, 2009, Plaintiff worked at CPS's Arena South location. In November 2009, Plaintiff was transferred and worked at CPS's SunTrust location. In December 2009, Plaintiff's employment status was converted from part-time to full-time. The parties dispute Plaintiff's title during those times, with Plaintiff asserting that he was "primarily a lot attendant" while Defendant states that Plaintiff was employed as a "special events cashier." (Docket Entry No. 22-20, Plaintiff's Reply to

---

[1] Upon a motion for summary judgment, the factual contentions are viewed in the light most favorable to the party opposing the motion for summary judgment. Duchon v. Cajon Co., 791 F.2d 43, 46 (6th Cir. 1986). As will be discussed infra, upon the filing of a motion for summary judgment, the opposing party must come forth with sufficient evidence to withstand a motion for directed verdict, Anderson v. Liberty Lobby, 477 U.S. 242, 247–52 (1986), particularly where there has been an opportunity for discovery. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). There are some factual disputes, but the Court concludes that those disputes are not material under the applicable law. Thus, this section does not constitute a findings of fact under Fed. R. Civ. P. 56.

Defendant's Statement of Undisputed Facts, at ¶5).

In March 2009, Plaintiff expressed interest in being considered for a valet supervisor position and held a discussion with Philip Thompson, CPS's Operations Manager, about the position. Id. at ¶4. Plaintiff asserts that the position was given to a "less experienced, less-educated employee," but does not cite any facts to support that assertion. Id.

At CPS, parking for events such as concerts, comedy shows, and sporting events is referred to as "special events." Id. at ¶5. In 2010, CPS's policy was to give each special events cashier a set of preprinted and sequentially numbered tickets at the beginning of each shift. Each cashier's set of tickets was recorded on "Special Events Checkout Sheets." Id. As special events parking customers enter the garage, they are given a ticket by the cashier. Id. It is disputed whether customers who use the garage for other purposes are required to make use of the same system. Id.

If a vehicle is found entering a location with an old ticket, such as one from a previous event, CPS special events cashiers are instructed to issue a new ticket and also request the old ticket from the customer, tear it in half, and retain it to give to the closing manager. Id. at ¶7. There are conflicting accounts as to whether a customer would be able to use an old ticket from a prior event. Id. While CPS contends that "there would be no legitimate reason for a cashier to allow a parker with a previously issued Ticket to enter the . . . garage and still possess that same Ticket on a subsequent day," Plaintiff asserts that "Central parking employees were not trained, authorized, or instructed to search customer's pocket or vehicle thoroughly to see whether a customer possesses an old, pre-issued ticket." Id.

The July 13, 2010 "Special Events Checkout Sheet" reflects that Plaintiff was issued tickets ranging from 179-401 to 179-486. Id. at ¶10. On July 22, 2010, Plaintiff was working as a Special

Events cashier at SunTrust. Id. at ¶ 8. Plaintiff was issued tickets ranging from 179-001 to 179-188. Id. That evening, Elisabeth Nugon,[2] a CPS area manager, performed a lot audit at the SunTrust location. Id.

Although Plaintiff asserts that a lot audit requires "a pre-audit between shifts and a car count" to "assist with determination of responsibility if there is a discrepancy or irregularity" (Docket Entry No. 22-5, Pl.'s Decl., at ¶4), CPS does not explicitly define these steps as being part of the audit process. The CPS rules and policies likewise do not address the procedure for a lot audit. (Docket Entry Nos. 16-5 and 16-6). CPS merely states that "a 'lot audit' is performed by inspecting the vehicles in a given parking lot to make certain that all of the vehicles in the parking lot have properly paid to park." (Docket Entry No. 22-20, Plaintiff's Response to Defendant's Statement of Undisputed Facts, at ¶9).

Nugon's audit report noted that she found "three vehicles where the ticket numbers were out of sequence; these tickets were from the sequence 179400-179601." (Docket Entry No. 13-4, at 3). After she verified that Plaintiff's ticket range for the event was from 179000 to 179201, Nugon touched the vehicles for warmth and "found them to be very hot (as if just parked)." Id. Nugon then sent Plaintiff home, and requested a meeting for the next day. (Docket Entry No. 22-20, Plaintiff's Response to Defendant's Statement of Undisputed Facts, at ¶12). Plaintiff's explanation for the hot cars was that "it was not unusual for customers to park their cars, walk around downtown, and then walk back to their cars and wait prior to the show for the purposes of drinking in their cars, enjoying the air conditioning and/or heat." Id. at ¶10. Plaintiff also asserts that during the lot audit, Nugon

---

[2] Ms. Nugon is now known as Elisabeth Tankersley and some documents refer to her as such, but for clarity is referred to as Nugon throughout this memorandum.

stated: "you immigrant, you should have been gone a long time ago." Id. at 14. Nugon denies making the statement. (Docket Entry No. 13-4, Nugon Decl., at ¶¶7-8).

On July 23, 2010, Richard Wagner, a CPS General Manager, reviewed Nugon's report, another employee's written statement, and the Special Events checkout sheets for July 13 and July 22, 2010. (Docket Entry No. 22-20, Plaintiff's Reply to Defendant's Statement of Undisputed Facts, at ¶13). Relying on the information provided, Wagner decided to terminate Plaintiff's employment, listing the reason as "violation of cash and ticket handling procedures. This is considered gross misconduct and is in violation of handbook rule #3." Id. Plaintiff called in sick on July 23, 2010, the day he was scheduled to have a meeting with CPS, so that meeting was rescheduled for July 29, 2010. Id. at ¶12.

On July 27, 2010, Wagner received a letter from Plaintiff's attorney, alleging that Nugon and Josh Artley, another CPS employee, had made disparaging statements about Plaintiff's immigration status on unspecified dates. Id. at ¶14. In the letter, Plaintiff states that Artley told him that Plaintiff was "taking American's jobs" and that Plaintiff should quit "so a good American" could replace him. Id.[3] In addition, Nugon's statement from the night of the lot audit was reported. Id.

On July 29, 2010, Plaintiff and his attorney appeared at CPS for Plaintiff's meeting with Wagner. Id. at ¶16. Wagner requested meeting with Plaintiff alone, but Plaintiff sought to have his attorney present at the meeting. Id. Wagner then deemed that Plaintiff was refusing to meet, and

---

[3] Plaintiff asserts that this event occurred in January 2010, and also that he informed a supervisor of the event, but does not cite any evidence in support. (Docket Entry No. 22-22, Plaintiff's Response to Defendant's Motion for Summary Judgment, at 11). As discussed infra, the Court is not required to search the record. Counsel's obligation under Local Rule 56.01 is to provide a precise citation for each factual assertion. In Plaintiff's EEOC charge, the alleged statements from Artley are listed as occurring in February 2010 and on July 21, 2010. (Docket Entry No. 22-4, EEOC Charge, at 1).

tendered Plaintiff's termination. Id. Plaintiff never heard Wagner make any derogatory comments regarding his national origin. Id. at ¶23.

On July 30, 2010, Plaintiff applied for unemployment benefits that were denied on August 12, 2010 based on a finding that Plaintiff was discharged under disqualifying conditions. (Docket Entry No. 22-11, Decision of Appeals Tribunal, at 1). Plaintiff appealed the decision, and the Tennessee Department of Labor and Workforce Development Employment Security Division Appeals Tribunal found that CPS had not met its burden of proof showing that misconduct occurred. Id. at 2. The tribunal cited the following facts in support: "No one saw the claimant [fraudulently reselling used tickets and taking the money for profit]," "there were no prior incidents to support a pattern of behavior," found it suspicious that "no one asked the claimant about what happened before firing him," and found it "reasonable to assume" that the customers who were cited would have complained had they not been in the wrong, but found no such complaints. Id.

On November 29, 2010, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Docket Entry No. 22-20, Plaintiff's Response to Defendant's Statement of Undisputed Facts, at ¶ 17). Plaintiff's charge alleges "harassment" from Artley in January 2010, disparaging statements about national origin by Artley in February 2010 and on July 21, 2010, and disparaging statements about national origin by Nugon on July 22, 2010. Id. Plaintiff also notes that CPS was sent a letter alleging discrimination by his attorney, which was received on July 27, 2010, and that he was terminated on July 29, 2010. Id.

On September 2, 2011 and November 19, 2010, Plaintiff's attorney sent letters to the EEOC with additional sets of facts regarding discrimination based on warnings not in Plaintiff's file, and excessive drug testing, neither of which were referenced in Plaintiff's initial EEOC charge. (Docket

Entry No. 22-18, at 1-4). The EEOC issued Plaintiff a right to sue letter.

CPS presents David Knapp as a comparator to Plaintiff, asserting that Knapp is American-born and was terminated for similar reasons as cited for Plaintiff's termination. (Docket Entry No. 22-20, Plaintiff's Response to Defendant's Statement of Undisputed Facts, at ¶ 19). Plaintiff asserts that Knapp was in fact treated differently from Plaintiff, and was given two prior warnings prior to termination for the reasons similar to Plaintiff. Id.

## B. Conclusions of Law

"The very mission of the summary judgment procedure is to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Advisory Committee Notes on Rule 56, Federal Civil Judicial Procedure and Rules (West Ed. 1989). Moreover, "district courts are widely acknowledged to possess the power to enter summary judgment sua sponte, so long as the opposing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); accord Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir. 1989).

In Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986), the United States Supreme Court explained the nature of a motion for summary judgment:

> Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact.

> As to materiality, the substantive law will identify which facts are
> material. Only disputes over facts that might affect the outcome of the
> suit under the governing law will properly preclude the entry of
> summary judgment. Factual disputes that are irrelevant or
> unnecessary will not be counted.

477 U.S. at 247–48 (emphasis in the original and added in part). Earlier the Supreme Court defined

a material fact for Rule 56 purposes as "[w]here the record taken as a whole could not lead a rational

trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita

Electrical Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citations omitted).

A motion for summary judgment is to be considered after adequate time for discovery.

Celotex, 477 U.S. at 326 (1986). Where there has been a reasonable opportunity for discovery, the

party opposing the motion must make an affirmative showing of the need for additional discovery

after the filing of a motion for summary judgment. Emmons v. McLaughlin, 874 F.2d 351, 355–57

(6th Cir. 1989). But see Routman v. Automatic Data Processing, Inc., 873 F.2d 970, 971 (6th Cir.

1989).

There is a certain framework in considering a summary judgment motion as to the required

showing of the respective parties, as described by the Court in Celotex:

> Of course, a party seeking summary judgment always bears the initial
> responsibility of informing the district court of the basis for its
> motion, and identifying those portions of "the pleadings, depositions,
> answers to interrogatories, and admissions on file, together with the
> affidavits, if any," which it believes demonstrate the absence of a
> genuine issue of material fact.... [W]e find no express or implied
> requirement in Rule 56 that the moving party support its motion with
> affidavits or other similar materials negating the opponent's claim.

Celotex, 477 U.S. at 323 (emphasis deleted).

As the Court of Appeals explained, "[t]he moving party bears the burden of satisfying Rule

8

56(c) standards." Martin v. Kelley, 803 F.2d 236, 239, n.4 (6th Cir. 1986). The moving party's

burden is to show "clearly and convincingly" the absence of any genuine issues of material fact. Sims

v. Memphis Processors, Inc., 926 F.2d 524, 526 (6th Cir. 1991) (quoting Kochins v. Linden–Alimak,

Inc., 799 F.2d 1128, 1133 (6th Cir. 1986)). "So long as the movant has met its initial burden of

'demonstrat[ing] the absence of a genuine issue of material fact,' the nonmoving party then 'must

set forth specific facts showing that there is a genuine issue for trial.'" Emmons, 874 F.2d at 353

(quoting Celotex and Rule 56(e)).

Once the moving party meets its initial burden, the United States Court of Appeals for the

Sixth Circuit warned that "the respondent must adduce more than a scintilla of evidence to overcome

the motion [and] . . . must 'present affirmative evidence in order to defeat a properly supported

motion for summary judgment.'" Street v. J.C. Bradford & Co., 886 F.2d 1472, 1479 (6th Cir. 1989)

(quoting Liberty Lobby). Moreover, the Court of Appeals explained that:

> The respondent must "do more than simply show that there is some
> metaphysical doubt as to the material facts." Further, "[w]here the
> record taken as a whole could not lead a rational trier of fact to find"
> for the respondent, the motion should be granted. The trial court has
> at least some discretion to determine whether the respondent's claim
> is "implausible."

Street, 886 F.2d at 1480 (citations omitted). See also Hutt v. Gibson Fiber Glass Products, 914 F.2d

790, 792 (6th Cir. 1990) ("A court deciding a motion for summary judgment must determine

'whether the evidence presents a sufficient disagreement to require submission to a jury or whether

it is so one-sided that one party must prevail as a matter of law.'") (quoting Liberty Lobby).

If both parties make their respective showings, the Court then determines if the material

factual dispute is genuine, applying the governing law.

> More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.
>
> ....
>
> Progressing to the specific issue in this case, we are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict-"whether there is [evidence] upon which a jury can properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed."

Liberty Lobby, 477 U.S. at 248, 252 (citation omitted and emphasis added).

It is likewise true that:

> In ruling on [a] motion for summary judgment, the court must construe the evidence in its most favorable light in favor of the party opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute....'

Bohn Aluminum & Brass Corp. v. Storm King Corp., 303 F.2d 425, 427 (6th Cir. 1962) (citation omitted). As the Court of Appeals stated, "[a]ll facts and inferences to be drawn therefrom must be read in a light most favorable to the party opposing the motion." Duchon v. Cajon Co., 791 F.2d 43,

46 (6th Cir. 1986).

The Sixth Circuit further explained the District Court's role in evaluating the proof on a summary judgment motion:

> A district court is not required to speculate on which portion of the record the nonmoving party relies, nor is it obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim. Rule 56 contemplates a limited marshalling of evidence by the nonmoving party sufficient to establish a genuine issue of material fact for trial. This marshalling of evidence, however, does not require the nonmoving party to "designate" facts by citing specific page numbers. Designate means simply "to point out the location of." Webster's Third New InterNational Dictionary (1986).
>
> Of course, the designated portions of the record must be presented with enough specificity that the district court can readily identify the facts upon which the nonmoving party relies; but that need for specificity must be balanced against a party's need to be fairly apprised of how much specificity the district court requires. This notice can be adequately accomplished through a local court rule or a pretrial order.

InterRoyal Corp. v. Sponseller, 889 F.2d 108, 111 (6th Cir. 1989). Here, the parties have given some references to the proof upon which they rely. Local Rules 56.01(b)-(d) require a showing of undisputed and disputed facts.

In Street, the Court of Appeals discussed the trilogy of leading Supreme Court decisions, and other authorities on summary judgment and synthesized ten rules in the "new era" on summary judgment motions:

> 1.   Complex cases are not necessarily inappropriate for summary judgment.
>
> 2.   Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

11

3.      The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case.

4.      This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

5.      A court should apply a federal directed verdict standard in ruling on a motion for summary judgment. The inquiry on a summary judgment motion or a directed verdict motion is the same: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."

6.      As on federal directed verdict motions, the "scintilla rule" applies, i.e., the respondent must adduce more than a scintilla of evidence to overcome the motion.

7.      The substantive law governing the case will determine what issues of fact are material, and any heightened burden of proof required by the substantive law for an element of the respondent's case, such as proof by clear and convincing evidence, must be satisfied by the respondent.

8.      The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

9.      The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

10.      The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is "implausible."

Street, 886 F.2d at 1479–80 (citations omitted).

The Court has distilled from these collective holdings four issues that are to be addressed upon a motion for summary judgment: (1) has the moving party "clearly and convincingly" established the absence of material facts?; (2) if so, does the plaintiff present sufficient facts to establish all the elements of the asserted claim or defense?; (3) if factual support is presented by the nonmoving party, are those facts sufficiently plausible to support a jury verdict or judgment under the applicable law?; and (4) are there any genuine factual issues with respect to those material facts under the governing law?

## A. Exhaustion of Remedies

Defendant contends that Plaintiff failed to exhaust his administrative remedies on his claims of failure to promote and discrimination based on taking drug tests frequently that are not in his EEOC charge. A Title VII plaintiff alleging discrimination must first file a charge with the EEOC within a certain time after the occurrence of the alleged wrongful act or acts. Younis v. Pinnacle Airlines, Inc., 610 F.3d 359, 361 (6th Cir. 2010). "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that were not included in his EEOC charge." Id. The purpose of this rule is to give "the employer information concerning the conduct about which the employee complains, as well as affording the EEOC and the employer an opportunity to settle the dispute." Id. Courts, however, recognize that "because aggrieved employees—and not attorneys—usually file charges with the EEOC, their pro se complaints are construed liberally, so that courts may also consider claims that are reasonably related to or grow out of the factual allegations in the EEOC charge." Id. at 362. Of course, "[t]his expanded rule does not mean ... that plaintiffs are excused from filing charges on a particular discrimination claim before suing in federal court." Davis v. Sodexho, 157 F.3d 460, 463 (6th Cir. 1998). Yet, "whe[n] facts related with respect to the charged claim would prompt the EEOC

13

to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim." Id.

Here, in his EEOC filing, Plaintiff concedes that he did not assert claims of failure to promote and discrimination based on taking drug tests frequently. (Docket Entry No. 22-22, Plaintiff's Response, at 7; Docket Entry No. 22-4, EEOC Charge). Plaintiff asserts that "later documentation indicates that investigation was done by the EEOC into both of these allegations as a result of further information provided to the EEOC." Id. The document cited and evidence filed, however, are letters from Plaintiff's attorney to the EEOC, with no indication that the EEOC investigated as a result of the additional information. (Docket Entry No. 22-18, Letters from Plaintiff's Attorney to EEOC). The Sixth Circuit set out the standard for EEOC filings in Younis for the following reasons: (1) giving the employer notice of the conduct, and (2) "affording the EEOC and the employer the opportunity to settle the dispute." Here, a letter from Plaintiff's attorney to the EEOC accomplishes neither result. Plaintiff's EEOC administrative charge did not allege facts nor assert any claims for failure to promote and excessive drug testing. Plaintiff's EEOC charge would not have caused the EEOC to investigate or consider a charge of a failure to promote and excessive drug testing. Accordingly, the Court concludes that Plaintiff's failure to promote and excessive drug testing claims are unexhausted and cannot be claims for relief in this action.

### B. National Origin Discrimination

As to Plaintiff's claim of discrimination based upon his national origin, Title VII of the Civil Rights Act of 1964, provides:

> It shall be an unlawful employment practice for an employer—
> (1) to fail or refuse to hire or to discharge any individual, or otherwise
> to discriminate against any individual with respect to his

> compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e–2(a).

Employers are liable under Title VII when a plaintiff can "establish that the defendant had a discriminatory intent or motive for taking a job related action." Ricci v. DeStefano, 557 U.S. 557, 577 (2009) (quoting Watson v. Fort Worth Bank & Trust, 487 U.S. 977, 986 (1988)). Whether a plaintiff is able to marshal direct evidence is crucial because with direct evidence, the plaintiff need not enter the McDonnell Douglas burden shifting framework, but instead, after making the prima facie case, the only shift is to the employer to "prove by the preponderance of the evidence that it would have made the same decision absent the impermissible motive." Chattman v. Toho Tenax America, Inc., 686 F.3d 339, 349 (6th Cir. 2012).

Plaintiff alleges that he was directly discriminated against when Nugon and Artley made disparaging statements to Plaintiff about his national origin. The statements included assertions that Plaintiff, as an immigrant, should have already quit his position, and asking why Plaintiff had not yet left his job so that "an American" could have it. (Docket Entry No. 22-20. Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, at ¶14). Nugon denies making the statements. (Docket Entry No.13-4, Nugon Decl. at ¶¶7-8). These statements, if truly made, are undoubtedly discriminatory. As the Sixth Circuit has held, similar uses of slurs have been found to be direct evidence of national origin discrimination. See Chattman, 686 F.3d at 347; DiCarlo v.

Potter, 358 F.3d 408, 416 (6th Cir. 2004).[4] As such, Plaintiff is able to establish direct evidence of discrimination.

For a prima facie showing of discrimination on the basis of national origin, Plaintiff must prove: (1) membership in the protected class; (2) that he suffered from an adverse action; (3) that he was qualified for the position; and (4) that he was treated differently from similarly situated members of the unprotected class. Chattman, 686 F.3d at 347.

Plaintiff's proof establishes that as a person of Eritrean origin, Plaintiff is a member of a protected class. As to Plaintiff's claim of adverse employment action, Plaintiff was discharged. Neither party disputes Plaintiff's qualifications for his position as a "Special Events cashier." Plaintiff contends that he was treated differently from a white employee who received warnings prior to termination, while Plaintiff was immediately terminated.

CPS asserts that Plaintiff's termination is unrelated to any purportedly discriminatory behavior because Wagner was the sole decisionmaker in this case, and thus Nugon and Artley's statements cannot be considered. In Vance v. Ball State University, __ U.S. __, 133 S. Ct. 2434 (2013), the Supreme Court set out the standard for which employees are considered to be "supervisors" for purposes of Title VII liability. "[A]n employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered the employee to take tangible employment actions against the victim, i.e., to effect a 'significant change in employment status, such as hiring, firing, failing to promote" etc. Id. at 2443. The Supreme Court crafted an exception to the rule, however, stating: "If an employer does attempt to confine decisionmaking

---

[4] The statements in DiCarlo were made by decisionmakers, while the statements in Chattman and in this case were made by nondecisionmakers. Whether Nugon and Artley's statements can be imputed to CPS will be discussed below.

16

power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee." Id. at 2452. "Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." Id.

Applying Vance here, CPS should be held liable for Nugon's statements if a jury finds that she made the alleged statements. While it is clear that Wagner was the sole decisionmaker in the decision to terminate Plaintiff, he did not interact with Plaintiff on a day to day basis. Wagner did not conduct the audit that gave rise to Plaintiff's dismissal. Wagner, instead, relied on Nugon's report and documentation in deciding whether to terminate Plaintiff. As such, this case falls squarely within the exception to Vance's general rule. CPS confined decisionmaking to a small number of individuals like Wagner, who relied on workers like Nugon to actually interacted with Plaintiff to inform his decisions. In relying on Nugon's recommendations in her report, Wagner effectively delegated the power to take tangible employment actions to Nugon. As such, CPS can be held liable for Nugon's statements. Whether Nugon made these statements is disputed by CPS. (Docket Entry No. 17, Nugon Decl. at ¶7-8). These disputes over Plaintiff's proof turn on the credibility of witnesses and such issues cannot be decided on a motion for summary judgment. Liberty Lobby, 477 U.S. at 255; Adams v. Metiva, 31 F.3d 375, 382 (6th Cir. 1994) ("the district court erred in finding plaintiff's and the two witnesses' accounts implausible and in granting summary judgment where issues of credibility were determinative of the case at hand"). As to Artley's statements, because there is no evidence that Artley affected Wagner's decision to terminate Plaintiff, the statements cannot be considered under Vance.

The burden then shifts to CPS to prove by the preponderance of the evidence that it would have made the same decision absent the impermissible motive. CPS asserts that "[t]he documentary evidence of [Plaintiff]'s rules violation is compelling" (Docket Entry No. 14, Memorandum in Support of Defendant's Motion for Summary Judgment, at 15), but the assertion is conclusory. CPS has not presented evidence that absent Nugon's report and documentation, CPS would have made the same decision to terminate Plaintiff. As such, CPS has failed to meet its burden of production. Moreover, because the credibility of witnesses cannot be assessed on a motion for summary judgment, the Court concludes that Defendant's motion for summary judgment on Plaintiff's claim of national origin discrimination should be denied.

### C. Retaliation

As to Plaintiff's retaliation claim under Title VII, this Circuit applies the McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), burden-shifting approach. To state a claim for employment discrimination under Title VII using indirect evidence, Plaintiff must establish a prima facie case, showing that: "(1) he engaged in activity protected by Title VII; (2) this exercise of protected rights was known to the defendant; (3) the defendant thereafter took adverse employment action against the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." Dixon v. Gonzales, 481 F.3d 324, 333 (6th Cir. 2007). If the plaintiff establishes a prima facie case of retaliation, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff, of course, bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination. Id.

To establish a causal connection between the protected activity and the adverse employment

action, "a plaintiff must produce sufficient evidence from which an inference could be drawn that the adverse action would not have been taken had the plaintiff not" engaged in protected activity. Nguyen v. City of Cleveland, 229 F.3d 559, 563 (6th Cir. 2000). The Sixth Circuit has stated that "[t]emporal proximity alone in the absence of other direct or compelling circumstantial evidence is generally not sufficient to support a finding of causal connection." Id. at 566; see also Weatherby v. Fed. Express, 457 Fed. App'x 480, 492 (6th Cir. 2012); Michael v. Caterpillar Fin. Servs. Corp., 496 F.3d 584, 596 (6th Cir. 2007); Ozier v. RTM Enters. of Ga., Inc., 229 Fed. App'x 371, 377 (6th Cir. 2007).

In the Sixth Circuit, temporal proximity may be sufficient where an employee's protected activity is immediately followed by an adverse employment action. Mickey v. Zeidler Tool & Die Co., 516 F.3d 516, 525 (6th Cir. 2008); see Singfield v. Akron Metro. Hous. Auth., 389 F.3d 555, 563 (6th Cir. 2004) (finding that temporal proximity of three months was "significant enough to constitute sufficient evidence of a causal connection for the purpose of satisfying [the plaintiff's] burden of demonstrating a prima facie case"); DiCarlo v. Potter, 358 F.3d 408, 421 (6th Cir. 2004) ("[T]his Circuit has embraced the premise that in certain distinct cases where temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise.").

"'[A]t the prima facie stage the burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible.'" Nguyen, 229 F.3d at 566 (quoting EEOC v. Avery Dennison Corp., 104 F.3d 858, 861 (6th Cir. 1997)). "'[A] court may not consider the employer's alleged nondiscriminatory reason for taking an

adverse employment action when analyzing the prima facie case.'" Grace v. USCAR, 521 F.3d 655, 677 (6th Cir. 2008) (citing Wexler v. White's Fine Furniture, 317 F.3d 564, 574 (6th Cir. 2003)).

CPS only disputes the causal connection between the decision to terminate and the protected activity. The protected activity is construed as the complaint manifested in the letter from Plaintiff's attorney that CPS received on July 27, 2010. (Docket Entry No. 16-9, Letter from Hoskins to CPS; Docket Entry No. 22-20, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, at ¶14). According to Wagner, the decision to terminate Plaintiff was made on July 23, 2010. (Docket Entry No. 16, Wagner Decl. at ¶5). As such, there is no causal connection between the letter sent to CPS and the decision to terminate.

Plaintiff also raises a number of other facts to support a theory of retaliation. The activity claimed between 2007 and January 2010 (Docket Entry No. 22-22, Plaintiff's Response to Defendant's Motion for Summary Judgment, at 11) was not raised in Plaintiff's EEOC charge and is temporally distant from Plaintiff's termination, which took place in July 2010. Moreover, all of the activity complained of is attributed to individuals who did not impact Wagner's decision to terminate Plaintiff, as discussed above. Id. As such, the Court concludes that Plaintiff's proof cannot not support a judgment on his Title VII retaliation claim.

## C. Damages

An employment discrimination plaintiff suing for back pay or front pay has a duty to avoid or minimize damages by using "reasonable diligence" to obtain "substantially equivalent" employment. Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 936 (5th Cir. 1996) (quoting Ford Motor Co. v. EEOC, 458 U.S. 219, 232 (1982)); see also, Smith v. JPMorgan Chase, No. 09–0168 2011 WL 841439, at *11 (W.D. La. March 8, 2011) (citing Migis v. Pearle Vision, Inc., 135 F.3d

1041, 1045 (5th Cir. 1998); Rasimas v. Michigan Dept. of Mental Health, 714 F.2d 614, 624 (6th Cir. 1983) (holding a plaintiff in an employment case must show that she attempted to mitigate her damages or face a reduction or forfeiture of the damage award.). Courts apply a two part test to determine if a plaintiff used reasonable diligence in mitigating damages: "First, [a] claimant must exercise reasonable diligence in obtaining substantially similar employment. Second, . . . the claimant must also use reasonable diligence in maintaining that substantially similar employment." Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 936 (5th Cir. 1996) (citing Sellers v. Delgado College, 902 F.2d 1189, 1193 (5th Cir. 1990); Brady v. Thurston Motor Lines, Inc., 753 F.2d 1269, 1277 (4th Cir.1985)) (emphasis added).

CPS contends that Plaintiff has not provided any documentation or pertinent testimony regarding his reasonable efforts to find work between July 2010 and December 2011, nor has he provided the name of any entity to whom he applied. (Docket Entry No. 22-20, Plaintiff's Response to Defendant's Statement of Undisputed Material Facts, at ¶22). Plaintiff responds that he "suffered from severe emotional distress and was under a doctor's care as a result of the discrimination against him and eventual termination, and as such failed to keep records outside of those submitted to maintain unemployment compensation." Id. Plaintiff further asserts that maintenance of unemployment compensation status meets the duty of minimizing damages, but cites no law in support of that conclusory assertion. (Docket Entry No. 22-22, Plaintiff's Response to Defendant's Motion for Summary Judgment, at 13). Both parties agree that Plaintiff's claim for back pay terminated as of December 19, 2011, when he secured employment that was higher-paying. (Docket Entry No. 14, Memorandum in Support of Defendant's Motion for Summary Judgment, at 19; Docket Entry No. 22-20, Plaintiff's Response to Defendant's Motion for Summary Judgment, at13).

Whether Plaintiff's emotional distress rises to the level of obviating "reasonable diligence" in efforts to secure employment is a fact intensive question for a jury to resolve, and as such, Defendant's motion for summary judgment on Plaintiff's claim for back pay between July 23, 2010 and December 19, 2011 should be denied.

### D. Conclusion

For these reasons, the Court concludes that the Defendant's motion for summary judgment (Docket Entry No. 13) should be denied as to Plaintiff's Title VII national origin claims and claims for back pay between July 23, 2010 and December 19, 2011. Defendant's motion for summary judgment is granted as to Plaintiff's claims of failure to promote and discrimination based on taking drug tests frequently, as well as his Title VII retaliation claim, and these claims are dismissed with prejudice.

An appropriate Order is filed herewith.

**ENTERED** this the _17_ day of July, 2014.

WILLIAM J. HAYNES, JR.
Chief Judge
United States District Court